# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CITY OF WARREN GENERAL EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0740-PAF |
| TALBOTT ROCHE and WILLIAM Y. TAUSCHER, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: August 10, 2020
Date Decided: November 30, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher P. Quinn, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; R. Bruce McNew, COOCH AND TAYLOR, P.A., Wilmington, Delaware; A. Rick Atwood, Jr., Randall J. Baron, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; *Attorneys for Plaintiff.*

Berton W. Ashman, Jr., Kevin R. Shannon, Callan R. Jackson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William Savitt, Anitha Reddy, Adam M. Gogolak, Zachary M. David, WACHTELL, LIPTON, ROSEN & KATZ LLP, New York, New York; *Attorneys for Defendants.*

**FIORAVANTI, Vice Chancellor**

This case concerns the acquisition of Blackhawk Network Holdings, Inc. ("Blackhawk" or the "Company") by two private equity firms, Silver Lake Partners, L.P. (collectively, with its affiliates, "Silver Lake") and P2 Capital Partners (collectively, with its affiliates, "P2"). Plaintiff alleges that two Blackhawk officers, CEO and President, Talbott Roche, and Executive Chairman, William Y. Tauscher, feared for their employment at Blackhawk because of pressure from an activist stockholder, Jana Partners LLC ("Jana"). Plaintiff alleges that Roche and Tauscher manipulated Blackhawk's Board of Directors (the "Board") into selling Blackhawk to Silver Lake and P2 in 2018 (the "Buyout") both to secure their own employment and to obtain equity in Blackhawk after the Buyout. The complaint also alleges that the proxy statement disseminated to Blackhawk's stockholders seeking their approval of the transaction was materially deficient.

Defendants have moved to dismiss the complaint in its entirety under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The complaint does not contest that ten of Blackhawk's twelve directors—all of whom approved the merger agreement (the "Merger Agreement") along with Roche and Tauscher—were disinterested and independent. The complaint does not contain well-pleaded allegations that Roche and Tauscher manipulated the board's deliberative process or otherwise misled the rest of the board into approving the transaction. The allegations that Roche and Tauscher were threatened by Jana lack

2

potency because Jana made no threat and because Jana sold its stock before Silver Lake and P2 proposed the Buyout. There are no well-pleaded allegations that Roche and Tauscher were motivated by the prospect of post-closing employment. The complaint thus does not state a claim that Roche and Tauscher breached their fiduciary duties by deceiving the rest of the Board into approving the transaction.

The complaint alleges that Roche and Tauscher were involved in preparing the proxy statement recommending the Buyout and are liable for materially misleading disclosures and omissions therein. The Court concludes that the Complaint states a claim that Roche breached her fiduciary duty of care as to disclosures concerning the management projections of potential earnings from acquisitions and the effect of the Merger Agreement's go-shop provision. Because disclosure claims against Roche for breach of fiduciary duty survive, the motion to dismiss is granted in part and denied in part.

## I. BACKGROUND

The facts recited in this opinion are drawn from the Verified Complaint (Dkt. 1) (the "Complaint" or "Compl.") and documents integral thereto, including documents produced in response to Plaintiff's demand under 8 *Del. C.* § 220.[1]

---

[1] The parties agreed that the documents produced to the Plaintiff in response to the 220 demand are incorporated by reference in the Complaint. Defs.' Opening Br. 5 n.1. In addition, the Complaint incorporates by reference the proxy statement recommending that the Company's stockholders approve the Buyout (the "Proxy"). The Proxy is attached as Exhibit 1 to the Transmittal Affidavit of Callan R. Jackson ("Jackson Aff.").

## A. The Company, Roche, and Tauscher

Blackhawk sells prepaid gift cards and reward cards. The Company operates three business segments: (1) U.S. Retail, which principally sells gift cards through U.S. retailers; (2) Incentives & Rewards, which provides prepaid products to businesses to support employee rewards and customer loyalty programs; and (3) International, which sells prepaid gift cards through retailers and directly to businesses outside of the U.S.[2]

Roche co-founded Blackhawk in 2001 as a division of Safeway, Inc. ("Safeway"), a publicly traded supermarket company.[3] Blackhawk was incorporated as a Delaware corporation in 2006.[4] In April 2013, Blackhawk completed an initial public offering of common stock.[5] After its initial public offering, Safeway remained Blackhawk's controlling stockholder.[6]

Tauscher served as the CEO of Blackhawk between 2013 and 2016.[7] Tauscher then became the Company's Executive Chairman (an executive officer position at the Company) and Head of International and Corporate Development.[8]

---

[2] Compl. ¶ 76.

[3] *Id.* ¶¶ 8, 12.

[4] *Id.* ¶ 12.

[5] *Id.*

[6] *Id.*

[7] Compl. ¶ 9.

[8] *Id.*

In February 2016, Roche succeeded Tauscher as CEO and became a director of the Company. After the Buyout, Roche continued to serve as Blackhawk's President and CEO. The Complaint alleges that Tauscher continued to serve as the Executive Chairman of the Company after the Buyout.[9]

## B. Jana Persuades Safeway to Spin Off Blackhawk.

In September 2013, not long after the Blackhawk IPO, Jana, a prominent activist investor,[10] disclosed that it had accumulated 6.2% of Safeway's common stock. Jana also disclosed that it had discussed with Safeway's management the prospect of Safeway transferring its stake in Blackhawk to Safeway's stockholders.[11] Seven months later, Safeway spun off Blackhawk by distributing its remaining Blackhawk shares to Safeway's stockholders.[12] After the spin-off, no single stockholder owned more than 9% of the total voting power of Blackhawk's common stock.[13] P2 was one of the Company's largest stockholders after the spin-off, and held more than 5% of the total voting power of the common stock.[14]

---

[9] *See id.* ¶ 111 ("As of the filing of the Complaint, Roche remains CEO and President of Blackhawk, and Tauscher remains Executive Chairman."). As discussed below, Defendants dispute this allegation.

[10] Jana waged approximately 75 activist campaigns between 2001 and 2017. *Id.* ¶ 38.

[11] *Id.* ¶ 13.

[12] *Id.* ¶ 14.

[13] *Id.* ¶ 15.

[14] *Id.*

5

### C. Jana and Blackhawk Enter into a Cooperation Agreement.

After Safeway spun off Blackhawk, Jana and Blackhawk entered into a Cooperation Agreement, dated March 16, 2017.[15] Pursuant to the Cooperation Agreement, Blackhawk expanded the Board from eleven to thirteen members and filled the two new seats with Jana's designees.[16] The agreement committed Blackhawk to include the two Jana designee directors in the Company's slate of director nominees for its 2017 annual meeting of stockholders. The Cooperation Agreement also required Blackhawk to form a "Cost Savings Committee" to review opportunities to increase cost savings.[17] In exchange for the benefits of the Cooperation Agreement, Jana agreed to standstill provisions.[18] One of the provisions prevented Jana from participating in a proxy solicitation regarding Blackhawk until the expiration of the Cooperation Agreement prior to the Company's 2018 annual stockholder meeting.[19]

In conjunction with the Cooperation Agreement, Tauscher "notified the Company of his intent to resign from his international and corporate development

---

[15] *Id.* ¶ 39.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Compl. ¶ 42. *See also* Blackhawk Current Report (Form 8-K) (Mar. 20, 2017). The Court can take judicial notice of this public filing. *Fortis Advisors LLC v. Allergan W.C. Hldg., Inc.*, 2019 WL 5588876, at *4 (Del. Ch. Oct. 30, 2019) (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 n.28 (Del. 2004)).

responsibilities," but that he would remain the Company's Executive Chairman and the Chairman of the Board.[20] Tauscher remained Executive Chairman throughout the Buyout process.[21] Blackhawk's CFO, Jerry Ulrich, also notified the Company that he would retire by the end of 2017.[22]

**D. Silver Lake and P2 Explore an Investment in the Company and the Company Retains a Financial Advisor.**

After the IPO, a key element of the Company's strategy was growth through acquisitions. From November 2013 through August 2017, Blackhawk bought 16 businesses—foreign and domestic—for an aggregate price of more than $1.1 billion.[23] In a February 2017 analyst call, Roche said, "We believe acquisitions can fuel our growth, even as growth rates slow in our traditional U.S. retail business."[24] Roche said that management viewed "acquisitions along with the buildout of our digital capabilities and platforms as the best allocation of our free cash flow and available borrowings."[25]

In early 2017, Silver Lake and P2 considered a minority investment in the

---

[20] Compl. ¶ 40.

[21] *Id.* ¶ 109.

[22] *Id.* ¶ 40.

[23] *Id.* ¶ 16.

[24] *Id.* ¶ 27.

[25] *Id.*

Company, with proceeds to fund future acquisitions.[26]  Blackhawk's management

met with Silver Lake and P2 to discuss the potential investment.[27]  In May 2017, the

Company executed confidentiality agreements with Silver Lake and P2 to facilitate

their discussions.[28]  In July 2017, Silver Lake and P2 proposed an investment.  The

Company permitted Silver Lake and P2 to conduct due diligence, but the Company

took no action on the proposal.[29]

Around August 2017, the Company retained the investment banking firm

Sandler O'Neill & Partners, L.P. ("Sandler") as its financial advisor to advise on

acquisitions and to assist with considering funding sources for the Company's

acquisition strategy, including the potential investment from Silver Lake and P2.[30]

Plaintiff alleges that Sandler had conflicts of interest in considering any

transaction between Blackhawk and Silver Lake.  In particular, the co-founder of

Sandler served on the board of directors of the Nasdaq with the co-founder of Silver

Lake for ten years.[31]  Sandler also served as the lead joint bookrunner for a Silver

Lake portfolio company in its initial public offering to cash out Silver Lake's pre-

---

[26] *Id.* ¶ 43.

[27] *Id.*

[28] *Id.*

[29] *Id.* ¶¶ 44–45.

[30] *Id.* ¶¶ 46–47.

[31] *Id.* ¶ 114.

IPO shares in 2015.[32]  Beyond these business relationships, Plaintiff alleges that one of the Silver Lake Managing Partners responsible for the Buyout, Michael Bingle, has golfed with James J. Dunne, III, the head of Sandler and representative of the Company, including as recently as January 2019.[33]  Plaintiff further alleges that one of the attorneys representing Blackhawk in connection with the Buyout golfed with Bingle and Dunne in September 2017.[34]  Plaintiff alleges that the lead lawyer representing the Company, Silver Lake Managing Partner Greg Mondre, and Dunn are all members of two exclusive golf clubs.[35]

**E.     The Board Considers Financing for the Company's Acquisitions, and Jana Sells Its Stock.**

On October 9, 2017, Sandler made a presentation to the Board regarding the potential acquisition of a company named Stored Value Solutions and identified potential sources of financing for future acquisitions (the "October 9 Presentation").[36]  The October 9 Presentation reviewed the Company's post-IPO acquisition history[37] and stated that management had prepared a model for a 2018–2020 budget assuming "aggregate M&A 'spending' of $1.1 billion over three years

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.* ¶¶ 48–49.

[37] *Id.* ¶ 49.

9

to be funded by the Company's free cash flow and debt financing." The Board, however, requested a budget reflecting a "more aggressive M&A strategy."[38] Accordingly, "[m]anagement also prepared an expanded model with $1.5 billion allocated to acquisitions; the incremental $400 million to be funded by issuing common stock as debt capacity limits were reached."[39] The October 9 Presentation analyzed the budgets prepared by management and possible sources of funding for future acquisitions. Based on its analysis, Sandler determined that there was a "full range of options to finance an aggressive M&A strategy," and concluded that, regardless of the "funding approach," the "expanded M&A strategy delivers significant value to shareholders."[40]

Plaintiff alleges that the expanded M&A strategy prepared by management and discussed by Sandler was uncertain because "the question remained whether an acquisition strategy could be pursued if Jana (and potentially other activists) agitated against it."[41] According to Plaintiff, in October 2017, Roche and Tauscher "understood that engineering a sale of Blackhawk to a private equity firm could allow them to profit personally from the pursuit of an acquisition strategy," without

---

[38] *Id.*

[39] *Id.*

[40] *Id.* ¶¶ 50–55.

[41] *Id.* ¶ 54.

10

interference by activist investors like Jana.[42]  However, by the time Sandler made the October 9 Presentation, Jana's influence on the Company had waned.  According to undisputed public filings submitted by Defendants that are subject to judicial notice,[43] Jana had sold its entire stake in Blackhawk no later than September 30, 2017.  Further, on October 6, 2017, one of Jana's two director designees resigned from Blackhawk's board.[44]  Other than Jana, the Complaint does not identify any activist investor that exerted or attempted to exert influence on Blackhawk.

### F.    Blackhawk Announces Negative Guidance.

On October 11, 2017, Blackhawk announced that it was lowering previously disclosed revenue guidance and that it expected the Company's adjusted EBITDA for 4Q 2017 and fiscal year 2017 to be "below the midpoint" of previously disclosed guidance.[45]   Roche attributed the revised guidance to "increasing competitive pressures" that would "result in lower growth in our U.S. retail physical channels going forward."[46]   The day after the announcement, the Company's stock price dropped from $44.20 per share to $35.15 per share.[47]

---

[42] *Id.* ¶ 55.

[43] *See* Jana, Form 13F Information Table (Nov. 14, 2017) (Jackson Aff. Ex. 4).

[44] Jackson Aff. Ex. 5.

[45] Compl. ¶ 58.

[46] *Id.*; *see also* Blackhawk, Current Report (Form 8-K) (Oct. 11, 2017).

[47] Compl. ¶ 59.

**G.     Silver Lake and P2 Submit Their First Indication of Interest.**

Within a week of the Company's announcement of lowered earnings guidance, Silver Lake and P2 contacted Roche to express their interest in taking the Company private. On October 20, 2017, Silver Lake and P2 jointly submitted a written indication of interest to pay $47 to $49 per share for the Company (the "First Indication of Interest").[48]  Silver Lake and P2 addressed the First Indication of Interest to Roche and Tauscher.[49] The First Indication of Interest stated that Silver Lake and P2 had "utmost respect and admiration for Blackhawk's leadership," that Silver Lake would be "a supportive investor" and "value-added partner," and that the capital structure resulting from any buyout would "permit management to pursue an aggressive, growth-oriented business plan."[50]  The First Indication of Interest suggested that Silver Lake and P2 were "uniquely well-positioned to complete this transaction efficiently" because they had already begun due diligence work with the Company.[51]  The First Indication of Interest further noted that any transaction could include a "customary post-signing 'go-shop' process allowing the Board to fulfill its duties."[52]  The Company's management permitted Silver Lake and P2 to conduct

---

[48] *Id.* ¶ 60.

[49] *Id.*

[50] *Id.*

[51] *Id.* ¶ 61.

[52] *Id.* ¶ 62.

12

further due diligence.[53]  In late October and early November, Blackhawk's senior management team, along with Sandler, met with Silver Lake and P2 to discuss the First Indication of Interest.[54]

### H.      The November 6, 2017 Board Meeting

On November 6, 2017, the Board met to discuss the First Indication of Interest.[55]  Management reported that Silver Lake and P2 were conducting due diligence.[56]  According to Blackhawk's management, the parties had "deferred any further discussion regarding transaction price" until additional due diligence had been completed.[57]  Sandler advised the Board that it "could always reject [the] proposal if it was not satisfied with the terms of the potential transaction."[58]  Roche and Tauscher told the Board that management had not been active in due diligence with the Company's potential acquisition of Stored Value Solutions because "management's current focus was on the potential transaction with Silver Lake and P2."[59]

In its November 6, 2017 Board presentation (the "November 6

---

[53] *Id.* ¶ 63.

[54] *Id.*

[55] *Id.* ¶ 64.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* ¶ 65.

Presentation"),[60] Sandler summarized Silver Lake's background, the terms of the First Indication of Interest, and the status of due diligence.[61] The November 6 Presentation compared two sets of management forecasts for 2017-2020—one prepared in July 2017 (the "July Forecast") and one prepared in November 2017 (the "November Forecast"). The July Forecast and the November Forecast both projected future EBITDA from acquisitions, in addition to other earnings metrics. The November Forecast assumed that the Company would spend $700 million in acquisitions from 2018 through 2020.[62] As compared to the July Forecast, the November Forecast generally projected lower revenue, adjusted EBITDA, and earnings per share, but higher EBITDA from acquisitions.[63]

## I. The November 21, 2017 Board Meeting

On November 21, 2017, Blackhawk's management provided the Board with a status update on the discussions with Silver Lake and P2. Roche told the Board that the Company was undertaking a "bottoms-up" financial analysis to create a 2018 budget.[64] Roche said that "the Company's expected performance in 2018 was likely to be lower than the range that had previously been provided to the Board as

---

[60] The November 6 Presentation is attached as Exhibit A to the Complaint.

[61] Compl. Ex. A at HAWK0000061–62.

[62] *Id.* at HAWK0000068.

[63] *Id.*

[64] Compl. ¶ 71.

projected in the 5-year plan."[65] Although not stated in the November 21, 2017 Board minutes, the Proxy discloses that Roche anticipated that the Company's performance in 2018 would be lower than previously expected because of "challenges in [the Company's] U.S. retail sector that would limit organic growth."[66] Roche reported that due diligence was "largely complete," and "Silver Lake and [P2] had been provided with a 5-year financial model that did not yet reflect the bottoms-up 2018 analysis that was currently underway," but that "management . . . provided Silver Lake and P2 . . . with a general overview of potential factors affecting the Company's future performance."[67]

At the November 21 meeting, Sandler presented a "preliminary valuation analysis . . . based on preliminary information provided by the Company" (the "November 21 Presentation").[68] The November 21 Presentation contained a table of implied EBITDA multiples based on illustrative ranges of the Company's adjusted EBITDA for 2018 and potential prices for the Company ranging from $45 to $51 per share.[69] For purposes of this presentation, Sandler considered

---

[65] *Id.*; *see also* Jackson Aff. Ex. 10.

[66] Compl. ¶ 71; Proxy 30.

[67] Jackson Aff. Ex. 10.

[68] Compl. ¶ 71; Jackson Aff. Ex. 11.

[69] Jackson Aff. Ex. 11 at 10 & 12. The November 21 Presentation is dated November 17, 2017, but is alleged to have been presented at the November 21 meeting.

management projections of the Company's 2018 adjusted EBITDA of $240 to $280 million, without acquisitions, and further assumed that adjusted EBITDA would grow by $20 million with acquisitions.[70]

The November 21 Presentation also contained a short list of "Key Dates" for a potential transaction with Silver Lake and P2. Sandler identified "February 9, 2018 – March 11, 2018," the "period during which [Blackhawk] shareholders can make proposals for annual meeting" as one of the "Key Dates."[71]

### J.     The December 4, 2017 Board Meeting

At a December 4, 2017, Board meeting, Sandler presented an update on the transaction process and an updated discounted cash flow analysis (the "December 4 Presentation").[72] The discounted cash flow analysis used a management forecast of $260 million in 2018 adjusted EBITDA, excluding acquisitions.[73] The December 4 Presentation also contained financial forecasts for 2018 adjusted EBITDA for each of the Company's business segments.[74]

Plaintiff alleges that a comparison between the segment analyses in the December 4 Presentation and the November Forecast contained in the November 6

---

[70] Compl. ¶¶ 71–72; Jackson Aff. Ex. 11 at 13, 17.

[71] Jackson Aff. Ex. 11 at 22.

[72] Jackson Aff. Ex. 12.

[73] *Id.* at 4.

[74] *Id.* at 5.

Presentation reveals that Roche's statement to the Board on November 21 that "challenges in [the Company's] U.S. retail sector . . . would limit organic growth" was false.[75] Specifically, Plaintiff alleges that, between November 6 and December 4, the "2018 Adjusted EBITDA forecast for the U.S. Retail segment was essentially unchanged" because the December 4 Presentation only reflected a 1.0% decrease in the forecast earnings from U.S. retail, and so Roche's statement at the November 21 meeting must have been false.[76]

## K.  Silver Lake and P2 Send a Second Indication of Interest.

On December 11, 2017, Silver Lake and P2 sent Tauscher and Roche a second indication of interest to acquire the Company for $44 to $45 per share (the "Second Indication of Interest").[77] The Second Indication of Interest stated that Silver Lake and P2 were "100% supportive of the management team," and "very enthusiastic about the opportunity to partner with you and the Blackhawk team to grow and maximize the value of the business."[78] The Second Indication of Interest said that Silver Lake's and P2's "plan" was to "support management in pursuing . . . opportunities in a private setting," and that Silver Lake had "significant experience

---

[75] Proxy 30.

[76] Compl. ¶ 76.

[77] *Id.* ¶ 77.

[78] *Id.*

partnering with management of market leading technology companies."[79]

## L. The December 13 Board Meeting

On December 13, 2017, the Board met to consider the Second Indication of Interest.[80] Roche "discussed the likelihood of challenges in pursuing the Company's long-term strategy of growing organically as well as by acquisition."[81] Roche noted that the Company faced limitations in the retail sector and difficulties in pursuing an acquisitive strategy as a public company, including because there was "pressure on the Company to return capital to shareholders, and the Company's high liquidity needs to fund acquisitions."[82] Roche thus advocated accepting the proposal.[83]

Sandler's December 13, 2017 Board presentation discussed Blackhawk's value and the difficulties the Company faced in achieving organic growth (the "December 13 Presentation").[84] The presentation summarized the Company's "Current Situation," including that Sandler had assisted the Company in August and September 2017 in "[u]sing the strength of a $42 – $45 stock price to pursue financing options to execute a robust acquisition strategy of $700 million to $1.5

---

[79] *Id.*

[80] *Id.* ¶ 79.

[81] Jackson Aff. Ex. 14.

[82] *Id.*

[83] Compl. ¶ 79.

[84] Jackson Aff. Ex. 15.

billion over several years."[85] According to Sandler, because of "headwinds facing organic growth, [the Company's] strategy requires it to be an active acquirer to achieve its growth objectives."[86] Sandler also noted that, "[i]n November, through [the Company's] diligence process . . . and in conversations with investors, challenges relating to [the Company's] ability to pursue its M&A strategy effectively surfaced."[87] One of the listed challenges was that Blackhawk's stockholders had become "more vocal in demanding a return of capital through stock buybacks."[88] Sandler observed that the Company's stockholders were "unsupportive of pursuing [an] M&A strategy" and were "impatient with reinvestment in the business."[89] Sandler advised that "it appears that the greatest value to current [Company] shareholders may be recognized by pursuing a take private transaction."[90]

The Board unanimously determined to pursue a potential transaction with Silver Lake and P2, and directed management to begin negotiating a transaction on the terms described in the Second Indication of Interest.[91]

---

[85] *Id.* at 3.

[86] *Id.* at 5.

[87] *Id.* at 4.

[88] *Id.*

[89] *Id.* at 5.

[90] *Id.* at 6.

[91] Jackson Aff. Ex. 14 at 3; Compl. ¶ 81.

**M.     Thoma Bravo Expresses Interest in Acquiring Blackhawk.**

On January 4, 2018, Thoma Bravo, LP ("Thoma Bravo," referred to as "Party A" in the Proxy) emailed Roche to express interest in discussing a potential acquisition of Blackhawk.[92]  Roche responded that she was "focused on year-end matters but that she would follow up[.]"[93]  In reality, Blackhawk's management was focused on the potential transaction with Silver Lake and P2.[94]  On January 8, 2018, Blackhawk's management returned a revised version of the Merger Agreement to Silver Lake and P2.[95]  According to Plaintiff, the revisions "almost entirely accepted" Silver Lake/P2's proposed deal protection measures, which Plaintiff characterizes as "extreme."[96]

**N.     The Board Approves the Buyout.**

At a January 11, 2018 Board meeting,[97] Roche reported on Thoma Bravo's expression of interest.[98]  The Board decided not to engage Thoma Bravo before entry into a merger agreement with Silver Lake and P2 because Thoma Bravo "would likely need to do significant diligence in order to finalize a potential transaction,"

---

[92] *Id.* ¶ 82; Defs.' Opening Br. 18.

[93] Compl. ¶ 82.

[94] *Id.* ¶ 83.

[95] *Id.*

[96] *Id.*

[97] *Id.* ¶ 84.

[98] *Id.* ¶ 86.

and engagement with Thoma Bravo "could result in the loss of the potential transaction" with Silver Lake and P2.[99] The Board reasoned that "the 'go-shop' provisions of the draft merger agreement would permit the Company to solicit an acquisition proposal from [Thoma Bravo] after signing a definitive merger agreement."[100]

Sandler's January 11 Board presentation (the "January 11 Presentation")[101] discussed decreased expectations for the Company's value. First, Sandler noted that, based on the Company's lowered guidance for the third quarter of 2017, the Company's stock had decreased from $44 per share to approximately $35 per share.[102] Further, Sandler explained that management expected to project the Company's 2018 adjusted EBITDA in the range of $240–250 million, which was below the median consensus estimate of $270 million.[103] Sandler also observed that there had been a "turnover in shareholders," and, as a result, "activists have been buying shares and requesting time with management" and that "shareholders have become more vocal in demanding a return of capital through share buybacks."[104]

---

[99] *Id.*

[100] *Id.*

[101] Jackson Aff. Ex. 17.

[102] *Id.* at 3.

[103] *Id.* at 4.

[104] *Id.*

Sandler indicated that, to achieve the value implied by an acquisition by Silver Lake and P2 for $44–$45 per share, the Company would need to achieve management's 2018 projections for 2018 and then "grow [a]djusted EBITDA at a compound annual rate of 10–18% per year for the 3 years ending 2021."[105]

During the following three days, the Company and Silver Lake/P2 negotiated the per-share purchase price. The process concluded with Silver Lake and P2 increasing the proposed purchase price from $44–$45 per share to $45.25.[106]

On January 14, 2018, the Board met to review the final terms of the transaction.[107] Roche provided "management's recommendation that the Board approve the proposed merger."[108] Sandler provided a final overview of the transaction terms and the value of the Company based on management's projected 2018 adjusted EBITDA of $240–$250 million, excluding acquisitions (the "January 14 Presentation").[109]

The Board unanimously approved entry into the Merger Agreement at the purchase price of $45.25 per share.[110] At that time, Blackhawk's Board consisted of

[105] *Id.* at 5.

[106] Compl. ¶ 88.

[107] *Id.* ¶ 89; Jackson Aff. Ex. 19.

[108] Compl. ¶ 89.

[109] Compl. ¶ 90; Jackson Aff. Ex. 18.

[110] Compl. ¶¶ 89–91; Jackson Aff. Ex. 19.

twelve members: Tauscher, Roche, Anil Aggarwal, Richard H. Bard, Thomas Barnds, Steven A. Burd, Robert L. Edwards, Mohan Gyani, Paul Hazen, Robert B. Henske, Arun Sarin, and Jane J. Thompson.[111] Of the twelve directors on the Board, only Tauscher and Roche were employees of Blackhawk.

### O. The Company Issues the Proxy, and the Buyout Closes.

On March 2, 2018, the Company disseminated the Proxy to its stockholders.[112] The Proxy disclosed the terms of the go-shop provision and the results of the go-shop process.[113] The Proxy also attached a copy of the Merger Agreement. In describing the go-shop provision, the Proxy stated:

> *Right to Receive Higher Offers*. The Blackhawk board of directors considered the Company's rights under the merger agreement to solicit higher offers during the go-shop period and to consider and negotiate certain higher offers thereafter, including:
>
> the Company's right to solicit offers with respect to acquisition proposals during a 25-day go-shop period and to terminate the merger agreement to enter into an agreement with respect to a superior proposal during the go-shop period, subject to Parent's right to receive payment of a termination fee.[114]

The Proxy stated (and Plaintiff does not dispute) that Thoma Bravo contacted Blackhawk shortly after the announcement of the merger to express interest in

---

[111] *Id.*

[112] Compl. ¶ 116.

[113] Compl. ¶¶ 116, 131–33; *see also* Proxy 33 (discussing results of go-shop process).

[114] *Id.* ¶ 132; Proxy 35.

pursuing a transaction during the go-shop period.[115] Thoma Bravo and the Company

engaged in due diligence during the go-shop period, but Thoma Bravo did not submit

a bid before the go-shop period expired.[116] According to the Proxy, Sandler

contacted eight strategic entities and five financial sponsors during the go-shop that

Sandler believed might be interested in acquiring the Company, but no one other

than Thoma Bravo expressed any interest in pursuing a transaction during the go-

shop period.[117]

The Proxy contained four sets of financial projections prepared by

management. The Proxy defined the first set of projections as the "Initial

Projections":

> Blackhawk's management prepared non-public, unaudited financial
> forecasts with respect to Blackhawk's business, as a standalone
> company, for fiscal years 2017 through 2020, which are referred to as
> the "Initial Projections." The Initial Projections were based on the
> information contained in Blackhawk's financial model, which was
> prepared by Blackhawk's management during the Summer of 2017
> from financial models used in connection with its annual internal
> planning processes, and were provided to Sandler O'Neill, the Sponsors
> and the Blackhawk board of directors in late October and early
> November 2017.[118]

With respect to the Initial Projections, the Proxy disclosed projected adjusted

---

[115] *Id.* at 33.

[116] *Id.*

[117] *Id.*

[118] *Id.* at 38.

EBITDA of $233 million for 2017, $275 million for 2018, $330 million for 2019, and $402 million for 2020, without acquisitions.[119] The Proxy also disclosed adjusted operating revenue, adjusted net income, and adjusted earnings per share for 2017 through 2020, without acquisitions. The Initial Projections correspond to the projections presented to the Board on November 6, 2017.

The Proxy defined the second set of projections as the "November Estimate Range."[120] The November Estimate Range refers to the projections in the November 21 Presentation, projecting $240–$280 million in adjusted EBITDA for 2018, without acquisitions.[121] The Proxy defined the third set of projections as the "Preliminary 2018 Plan."[122] The Preliminary 2018 Plan refers to the estimate provided to the Board on December 4, 2017 that the Company would earn $260 million in adjusted EBITDA, without acquisitions.[123] The Proxy defined the fourth set of projections as the "Revised Projections."[124] The Revised Projections refer to the Company's projection that it would earn $240–$250 million in adjusted EBITDA, without acquisitions, as used in the January 11 Presentation and the

---

[119] *Id.*

[120] *Id.* at 38–39.

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Id.*

January 14 Presentation.[125]

On March 20, 2018, the Company filed a Proxy supplement (the "Proxy Supplement"). The Proxy originally noted that, after the Buyout, there would be a "new equity incentive plan for certain employees of Blackhawk," and that "the terms of such equity incentive plan or any other post-closing compensation or benefits arrangements have not been agreed to otherwise determined as of the date" of the Proxy.[126] The Proxy Supplement stated: "[b]etween October 18, 2017 when [Silver Lake and P2] expressed interest in an acquisition of the Company and the execution of the merger agreement on January 15, 2018, there were no discussions between [Silver Lake and P2] and the Blackhawk executive officers regarding any terms pursuant to which the Blackhawk executive officers might be retained after the closing."[127] The Proxy Supplement stated that "none of the Blackhawk executive officers entered into any agreements with respect to post-closing employment" during the same period.[128]

On March 30, 2018, Blackhawk's stockholders approved the Merger Agreement. Ultimately, 99.6% of voting shares voted in favor of the merger.[129] The

---

[125] *Id.*

[126] *Id.* at 52; Compl. ¶ 112.

[127] Jackson Aff. Ex. 21.

[128] *Id.*

[129] Jackson Aff. Ex. 22.

Buyout closed on June 15, 2018.[130]

## II.  PROCEDURAL HISTORY

On March 27, 2018, Plaintiff served on Blackhawk a demand to inspect books and records pursuant to 8 *Del. C.* § 220.  On May 11, 2018, Plaintiff filed an action in this Court to compel inspection.  *See City of Warren Gen. Empls.' Ret. Sys. v. Blackhawk Network Holdings, Inc.*, C.A. No. 2018-0339-TMR (Del. Ch.).  The parties resolved the books and records litigation, with the Company producing books and records in response to the demand.  Plaintiff later utilized those books and records in drafting the Complaint in this action, which was filed on September 13, 2019.

Defendants moved to dismiss the Complaint in its entirety on January 8, 2020 under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[131]  On August 10, 2020, the Court heard oral argument on the motion.

## III.  ANALYSIS

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate

---

[130] Jackson Aff. Ex. 23.

[131] Dkt. 20.

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (internal citations and quotation marks omitted); *accord Central Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

"[A] trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'" *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)). "Moreover, a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede*, 780 A.2d at 1083.

Directors of a Delaware corporation owe the fiduciary duties of care and loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, "[i]n the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 44 (Del. 1994) (citing *Revlon*, 506 A.2d at 182). *Revlon* tests directors' conduct for reasonableness: "directors are generally free to select the path

28

to value maximization, so long as they choose a reasonable route to get there." *In re Dollar Thrifty S'holder Litig.*, 14. A.3d 573, 595–96 (Del. Ch. Sept. 8, 2010). "[T]here is no single blueprint that a board must follow to fulfill its duties." *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989).

In this action, Plaintiff does not assert any claim against any member of the Board in their capacities as directors. Rather, the Complaint contains a single count alleging Roche and Tauscher breached their fiduciary duties in their capacities as officers of Blackhawk.[132] Plaintiff advances two theories in support of its claim. First, Plaintiff alleges that Roche and Tauscher manipulated the Board to favor the Buyout at the expense of the Company and its stockholders in order to maintain their employment and earn equity in the post-Buyout entity. Second, Plaintiff alleges that Roche and Tauscher breached their fiduciary duties by misleading Blackhawk's stockholders through a materially misleading Proxy. This Opinion addresses each claim in turn.

---

[132] Compl. ¶ 141 ("Roche and Tauscher, acting as officers, have violated their fiduciary duties owed to the public stockholders of Blackhawk."). Under Delaware law, officers of a corporation owe the same fiduciary duties as directors. *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009).

**A. The Complaint Does Not State a Claim that Roche and Tauscher Breached Their Fiduciary Duties by Misleading or Manipulating the Board.**

The Buyout was a sale of control of the Company, and as a result, the *Revlon* standard of review would ordinarily apply to a challenge to the Board's action in approving the Buyout. *Paramount*, 637 A.2d at 48. The Court of Chancery has held that the "paradigmatic . . . good *Revlon* claim" is "when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price."[133] The Complaint in this case, however, does not directly challenge any board action, but rather the actions of Roche and Tauscher as officers.[134] Plaintiff's legal theory is grounded in a line of recognized "iconic cases . . . that are premised on independent board members not receiving critical information from conflicted fiduciaries" and where

---

[133] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1002 (Del. Ch. 2005); *see also In re Mindbody, Inc.*, 2020 WL 5870084, at *12 (Del. Ch. Oct. 2, 2020) (discussing the same).

[134] The Complaint thus offers no occasion to directly evaluate the reasonableness of the Board's transaction process under the heightened scrutiny standard imposed by *Revlon. See, e.g., In re Mindbody, Inc.*, 2020 WL 5870084, at *32 n.287 ("It is an open issue of Delaware law as to whether *Revlon* applies to an officer's actions."); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 n.149 (Del. Ch. Oct. 27, 2020) (assuming that a "breach of an officer's duty of care should be assessed under the traditional gross negligence standard with respect to actions taken in the context of a sale of control transaction because it is the members of the board of directors—not the officers—who are responsible for the type of decisions that are the focus of enhanced scrutiny review under *Revlon* and its progeny."). As discussed further below, the Board's process is nevertheless relevant to the extent it concerns whether Roche and Tauscher breached their fiduciary duties as officers.

"impartial board members did not oversee conflicted members sufficiently." *Kahn v. Stern*, 2018 WL 1341719, at *1 n.4 (Del. 2018) (TABLE). The progenitor case in this area is *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989), in which the Delaware Supreme Court held that an officer may breach her fiduciary duty during a sale process where the officer has engaged in "illicit manipulation of a board's deliberative processes" in pursuit of the officer's own self-interest.

To state a claim for breach of the fiduciary duty under this theory, Plaintiff must plead that Roche and Tauscher "were interested in the transaction, lacked independence, or acted in bad faith."[135] In particular, to prevail on a *Macmillan* claim and rebut the business judgment rule, Plaintiff must "allege that [the officers were] acting out of self-interest and [the officers] deceived the rest of the board into approving the transaction."[136] Plaintiff contends its "Complaint pleads detailed facts 'that support a rational inference of bad faith' on the part of Roche and Tauscher."[137] This Opinion first addresses Plaintiff's argument that Roche and Tauscher were self-interested before addressing Plaintiff's contentions that the Board was supine and that Roche and Tauscher deceived the Board into approving the Buyout.

---

[135] *Morrison v. Berry*, 2019 WL 7369431, at *13 (Del. Ch. Dec. 31, 2019).

[136] *City of Miami Gen. Emps. and Sanitation Emps. Ret. Trust v. Comstock*, 2016 WL 4464156, at *19 (Del. Ch. Aug. 24, 2016), *aff'd*, 158 A.3d 885 (Del. 2017) (TABLE).

[137] Pl.'s Ans. Br. 3 (quoting *Stern*, 2018 WL 1341719, at *1).

### 1. The Complaint Does Not Adequately Allege that Roche and Tauscher Were Tainted by Self-Interest in the Buyout.

Plaintiff contends that Defendants were self-interested because activist stockholders threatened their employment with Blackhawk. Plaintiff further contends that Defendants sought to secure post-closing employment with Blackhawk to earn part of a "typical management equity pool following a private equity buyout" and then profit from the Company's acquisition strategy.[138]

### a. Activist Pressure Did Not Threaten Roche and Tauscher's Jobs.

The Complaint lacks any allegation that Jana or any other activist stockholder communicated any threat to remove Roche or Tauscher from their employment with the Company. Plaintiff instead argues that the Court should infer that Jana threatened Roche's and Tauscher's employment from the Company's announcement of the Cooperation Agreement on the same date that Tauscher announced that he would limit his executive responsibilities and Blackhawk's CFO announced that he was going to retire.[139] This allegation does not support a reasonable inference that Roche and Tauscher feared for their jobs.

As an initial matter, even assuming that Tauscher's announcement coinciding with the announcement of the Cooperation Agreement was Jana's doing, it is not

---

[138] *See* Pl.'s Ans. Br. 52–62.

[139] *Id.* at 54–55.

reasonable to infer that Roche was similarly threatened. Plaintiff argues that Roche was the "logical next target" because a *Wall Street Journal* article reported that in early 2017 activists were "a perennial nuisance for chief executives" and that they "helped push out the leaders of three high-profile S&P 500 companies."[140] The news article cannot substitute for well-pleaded allegations. No activists announced any campaign targeting Blackhawk's management. It is not reasonably conceivable that Roche felt threatened for her job at Blackhawk because a *Wall Street Journal* article attributed to certain activist investors the demise of three CEOs at companies other than Blackhawk. Indeed, the Complaint does not even allege that any of the activist stockholders mentioned in the article held any Blackhawk stock.

Plaintiff's allegations based on Jana's potential threat to Roche and Tauscher's positions are not reasonable. First, there is no allegation that Jana made a statement that could be construed as a threat to Roche or Tauscher's positions. Plaintiff's attempt to leverage the timing of the announcements concerning Tauscher and Blackhawk's CFO that coincide with the Cooperation Agreement also lack any persuasive force. That inference relies on the existence of Jana as a continuing threat to Roche and Tauscher. But the facts do not support that inference because Jana had already sold its Blackhawk stock by the time Silver Lake and P2 submitted the First

---

[140] Compl. ¶ 110 n.4 (quoting David Benoit, "Activist Investors Have a New Bloodlust: CEOs," *Wall St. J.* (May 16, 2017) (*available at* https://www.wsj.com/articles/activist-investors-have-a-new-bloodlust-ceos-1494936001); *see also* Pl.'s Ans. Br. 54–55 (same).

Indication of Interest. Silver Lake and P2 submitted the First Indication of Interest on October 20, 2017, and Jana disclosed that it had sold all of its stock in the Company no later than September 30, 2017.[141] Thus, even drawing all reasonable inferences in favor of Plaintiff, Jana was no longer in a position to exert pressure on the Company or management after it sold its shares and is not alleged to have done so.[142]

After Defendants pointed in their Opening Brief that Jana sold its Blackhawk stock by no later than September 30, 2017, Plaintiff brushed it off as "irrelevant."[143] In its Answering Brief, Plaintiff argued that Sandler's presentations support an inference that Roche and Tauscher feared that other, unidentified activists sought to remove them. According to Plaintiff, Roche and Tauscher feared for their jobs

---

[141] Plaintiff does not contest that Jana sold its shares by the time of the Buyout. Pl.'s Ans. Br. 55.

[142] It is notable that the Complaint does not mention that Jana sold its stock in the Company before Silver Lake and P2 proposed the Buyout. The Complaint focused on Jana to the exclusion of other stockholders. Compl. ¶ 1 ("This case is about a CEO's and an Executive Chairman's response to activist pressure."); *id.* ¶ 3 ("In 2017, Blackhawk was under activist pressure. Famed activist hedge fund Jana Partners LLC ("Jana") had gained two seats on the Company's board of directors (the "Board") in a settlement of a potential proxy fight. Jana had forced Tauscher's ouster from his job leading Blackhawk's international and corporate development efforts and had also forced the ouster of Blackhawk's CFO. Jana was also demanding stock buybacks in lieu of acquisitions and reinvestment in the Company's business.").

[143] Pl.'s Ans. Br. 55 (arguing that "Jana's sale of shares is irrelevant" because Sandler reported on other activists and "[t]he identity of the specific activist . . . Roche and Tauscher feared at the end of the process is irrelevant to this motion."). Plaintiff neither alleges nor argues that the remaining director appointed by Jana, Robert Henske, sought to replace Roche or Tauscher or expressed dissatisfaction with their performance.

because Sandler listed the "period during which [Blackhawk] shareholders can make proposals for [the] annual meeting" as a "Key Date" in the November 21 Presentation and because Sandler reported in the January 11 Presentation that unnamed activists had purchased shares and "request[ed] time with management."[144]

Plaintiff analogizes the Complaint to *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677 (Del. Ch. Dec. 10, 2018), which involved an activist stockholder's threat to replace an officer. The analogy highlights what is missing from the Complaint. In *Xura*, the CEO "knew that both the Board and stockholder activists were displeased with his performance and likely would remove him from office if a sale of the Company did not occur." *Id.* at *13. In *Xura*, "[m]ajor stockholders . . . openly questioned" the CEO's performance. *Id.* at *8. These threats were concrete: in *Xura*, the stockholder plaintiff had declared that it "intended to launch a proxy contest" and "made clear to both [the CEO] and the Board its view that Xura should find a new CEO." *Id.* The Chairman of Xura "privately advised [the CEO] that the Board was considering major changes if there was no deal, including changes at . . . the highest rank of management." *Id.* Plaintiff's allegations here are not remotely comparable.[145] Because there are no well-pleaded allegations that Roche and

---

[144] Compl. ¶¶ 73, 87.

[145] Nor is this case similar to *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072 (Del. Ch. Apr. 11, 2012), where the company's 30% stockholder "informed the Board that if [the company] could not be sold in the near future, then [the company's] entire management

35

Tauscher were in danger of losing their employment at Blackhawk, it is not reasonably conceivable that they sought to avoid any threat by engineering the Buyout. *See Wayne Cty. Emps.' Ret. Sys. v. Corti*, 2009 WL 2219260, at *11–13 (Del. Ch. July 24, 2009) ("That Kotick and Kelly did not have to pursue the transaction with Vivendi in order to retain their positions as managers significantly alleviates the concern that Kotick and Kelly were acting out of an impermissible 'entrenchment' motive"), *aff'd*, 996 A.2d 795 (Del. 2010); *Comstock*, 2016 WL 4464156, at *20 (dismissing a *Macmillan* claim in part because "there is no allegation that [the CEO's] position was in danger").[146]

### b. Plaintiff Has Not Adequately Pleaded Defendants Were Disloyal Because They Sought Post-Closing Employment.

Plaintiff contends that Roche and Tauscher had a conflict of interest because they were motivated by the prospect of continued employment at Blackhawk after

---

team, including [the CEO], would be replaced" and the CEO discussed the prospect of keeping his position at the company after the buyout with the acquirer. *Id*. at **2, 7.

[146] Plaintiff contends that *Corti* and *Comstock* are distinguishable because they involved strategic acquirers rather than a management-sponsored buyout. Pl.'s Ans. Br. 59–60. But the Buyout is not a management-sponsored buyout. "[A]n MBO is a transaction 'where, when it is negotiated, senior management was a participant in the transaction as an acquirer." *In re Appraisal of Solera Hldgs., Inc.*, 2018 WL 3625644, at *23 (Del. Ch. July 30, 2018). Neither Roche nor Tauscher are alleged to be affiliated with Silver Lake and P2. *See Corti*, 2009 WL 2219260, at *13 ("There is much less cause for concern where managers will continue their employment with the combined post-transaction entity, than when the conflicted managers are bidders in an auction for control of the company, and are thereby seeking to transfer control of the company to themselves personally.").

36

the Buyout. There are no allegations that any employment offers were extended or that employment discussions were had prior to closing the transaction. Instead, the Complaint seizes on complimentary statements in the indications of interest that Silver Lake and P2 were "100% supportive of the management team," "very enthusiastic about the opportunity to partner with you," and a reference to prior discussions of a "capital structure . . . for Blackhawk [that] would permit management to pursue an aggressive, growth-oriented business plan."[147]  Plaintiff also alights on the Proxy's disclosure that there would be a "new equity incentive plan" for "certain employees of Blackhawk" after the Buyout.[148]  Plaintiff seeks to buttress these allegations by quoting a law review article's observation that management can reap "generational wealth" from a private equity buyout because, according to Plaintiff, the "typical management equity pool following a private equity buyout is 10% to 15% of total equity."[149]

The Complaint's allegations are insufficient, and the law review article quotation cannot make up for their inadequacy. The Complaint does not allege that Roche and Tauscher knew at any time before entry into the Merger Agreement that

---

[147] Compl. ¶¶ 60, 130.

[148] Proxy 52.

[149] *See* Compl. ¶¶ 55–57; Pl.'s Ans. Br. 16, 26, 57 (citing Guhan Subramanian & Annie Zhao, *Go-Shops Revisited*, 133 HARV. L. REV. 1215 (2020)).

they would continue their employment in any capacity at Blackhawk after closing.[150]

Likewise, there are no allegations that Roche and Tauscher entered into employment agreements or discussed terms of employment with Silver Lake and P2 during the Buyout process. There are no allegations that Roche or Tauscher otherwise acted to secure post-close employment during the Buyout process. The Proxy's disclosure that there would be a "new equity incentive plan" for "certain employees" does not support a reasonable inference that Roche and Tauscher knew that they would participate in the equity plan, let alone to what degree.[151] Nor are there any allegations that Roche or Tauscher had any discussions with Silver Lake or P2 about post-closing employment prior to execution of the Merger Agreement.[152] Even if

---

[150] It is undisputed that Roche continued to serve as the Company's CEO and President after closing. Compl. ¶ 111. There is, however, a disputed question of fact as to whether Tauscher was employed by Blackhawk after closing. In their briefing, Defendants disputed that Tauscher held any "executive position" at Blackhawk after the Buyout and asserted that Plaintiff had not pleaded as much. *See* Defs.' Opening Br. 2–3. The Complaint, however, pleads that Tauscher "remain[ed] Executive Chairman" after closing. Compl. ¶ 111. In its Answering Brief, Plaintiff states the basis for this allegation is a reference to Tauscher's then-current profile on the social media site LinkedIn. Pl.'s Ans. Br. 56 n.12. As the Court must, this Opinion takes as true the well-pleaded allegation that Tauscher remained as the Company's Executive Chairman after the Buyout.

[151] *Contra City of Ft. Myers Emps.' Pension Fund v. Haley*, 235 A.3d 702, 705 (Del. 2020) (concluding complaint alleged that the company's CEO and lead negotiator was materially interested in the merger when he was presented with a compensation proposal during price renegotiations that would provide him with a more than five-fold increase in equity compensation).

[152] According to the Proxy Supplement, the Second Indication of Interest "did not discuss retention of Blackhawk's executive officers after the closing of the potential transaction." Jackson Aff. Ex. 21. It further states that between the time that Silver Lake/P2

38

Roche and Tauscher thought they would be employed post-closing, there is no allegation or reasonable inference that they knew or believed that any equity incentive plan would be superior to their prospects with Blackhawk as a standalone entity. In this regard, Plaintiff's assertion that Roche and Tauscher stood to receive "generational wealth" is entirely speculative: there is nothing in the Complaint supporting a reasonable inference that Roche and Tauscher knew that any post-closing employment would be materially better than the employment terms that Roche and Tauscher already enjoyed.[153]

The foundation for Plaintiff's argument that Roche and Tauscher were self-interested is built on the alleged management-friendly language in the indications of interest. For this, Plaintiff again relies on *Xura*. But *Xura* was vastly different. In *Xura*, the Court held that stockholders were not fully informed by the Proxy in part because a prospective buyer "made clear its intention to work with management

---

communicated their Initial Indication of Interest in October 2017 and the execution of the Merger Agreement "there were no discussions between [Silver Lake/P2] and the Blackhawk executive officers regarding any terms pursuant to which the Blackhawk executive officers might be retained after the closing of the potential transaction, and none of the Blackhawk executive officers entered into any agreements with respect to post-closing employment." *Id.*

[153] *See In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *9 (Del. Ch. Oct. 13, 2011) ("allegations of pecuniary self-interest must allow the Court to infer that the interest was of a sufficiently material importance, in the context of the [fiduciary]'s economic circumstances, as to have made it improbable that the [fiduciary] could perform her fiduciary duties without being influenced by her overriding personal interest.") (internal quotation marks omitted).

(including [the CEO]) after consummation of the Transaction in all of its offer letters to the Company." *Xura*, 2018 WL 6498677, at *12. As in *Xura*, the indications of interest submitted by Silver Lake and P2 promised cooperation with the future management team, implying a wish to hire the Company's managers after the Buyout. *Compare id.* at *2 (offer letter indicating the buyer was "impressed by the senior leadership team" and was "excited about the prospect of partnering with them"), *with* Compl. ¶ 60 (indication of interest stating that Silver Lake would serve as a "value-added partner to the Company" and that, "as we have discussed before, the capital structure we envision for Blackhawk … would permit management to pursue an aggressive, growth-oriented business plan").

As before, *Xura* is distinguishable because the Complaint does not allege misbehavior comparable to the panoply of culpable conduct alleged in *Xura*. Among other things, the Xura CEO was engaged in unauthorized discussions with the acquirer, which included potential future acquisitions. *Xura*, 2018 WL 6498677, at *6. The plaintiff in *Xura* also alleged that the company's CEO deliberately injured his own company's ability to bargain with a bidder to save his own job. As one example, the Court observed that it was "remarkable to see evidence that a CEO undermined the authority and questioned the competency of his CFO in direct communications with a potential acquirer at the peak of negotiations during a sale process. Yet, that is what the pled evidence reveals here." *Id.* at *13 n.129. As

another example, the conflicted CEO advised the prospective buyer at what price it should bid. *Id.* at \*5–6 ("With a gentle nudge, [the CEO] told [the acquirer] that the offer price should be $28 per share . . . . [the CEO] did not inform anyone at Xura . . . about his meeting with [the acquirer] either before or after it occurred.").

Cast against this backdrop, the offer letters by the acquirer in *Xura* took on an import beyond what is reasonably attributable to the indications of interest by Silver Lake and P2 in the context of the Complaint. There are no allegations of: (1) a specific threat to Roche or Tauscher; (2) that Roche and Tauscher feared for their jobs, or (3) that they conspired with Silver Lake and P2 to corrupt the transaction process. Instead, the Complaint bears more similarity to *Comstock*, where the allegations "failed to demonstrate the type of deceitful conduct necessary to trigger entire fairness under a *Macmillan* theory" and there was "no allegation that [the CEO's] position was in danger or that his new employment terms were materially different than his existing terms." *Comstock*, 2016 WL 4464156, at \*19–22. As in *Comstock*, at the time of the Proxy, Roche and Tauscher held significant amounts of stock—510,205 shares and 1,093,0637 shares, respectively[154]—that aligned their interest with the Company's stockholders. *See id.* at \*20; *see also Chen v. Howard-Anderson*, 87 A.3d 648, 670–71 (Del. Ch. 2014) (discussing the alignment of

---

[154] Proxy 82.

interests between fiduciaries and stockholders where fiduciaries own material amounts of common stock). For those reasons, the Complaint does not adequately allege that Roche and Tauscher were self-interested during the Buyout process.[155]

### 2. The Complaint Does Not Adequately Allege that Roche and Tauscher Manipulated or Deceived the Board into Approving the Buyout.

Plaintiff alleges Roche and Tauscher breached their fiduciary duties as officers by preventing the Board from properly exercising its business judgment. This Court recently addressed a similarly targeted claim against corporate officers in *In re Baker Hughes, Inc. Merger Litig.*, 2020 WL 6281427 (Del. Ch. Oct. 27, 2020). There, as here, the "key issue" was whether the Complaint pleaded facts "to support a reasonably conceivable claim that [the officers] tainted the decisionmaking of [the] concededly independent and disinterested directors[.]" *Id*. at *19. Here, even assuming the Complaint contained sufficient allegations that Roche and Tauscher suffered from a material conflict of interest (and it does not), the Complaint fails to allege that Roche and Tauscher breached their fiduciary duty of loyalty by manipulating or deceiving the Board into approving the Buyout.

---

[155] In *Xura*, the plaintiff had the benefit of additional discovery from a related appraisal action. In the event that Plaintiff later obtains information indicating that Roche and Tauscher engaged in deceitful conduct only absent from the Complaint for lack of discovery, the Court is not precluded from revisiting this issue. *See In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *43 (Del. Ch. June 11, 2020); *In re Mindbody, Inc.*, 2020 WL 5870084, at *34 n.309.

### a. The Complaint Does Not Contain Well-Pleaded Allegations Supporting a Reasonable Inference that the Board Was Supine.

Plaintiff argues that this case represents the paradigmatic "good *Revlon* claim . . . when a supine board under the sway of an overweening CEO bent on a certain direction, tilts the sales process for reasons inimical to the stockholders' desire for the best price."[156] For example, in *Macmillan*, the board of directors was "torpid, if not supine" because it "plac[ed] the entire process in the hands of [the company's] chairman and CEO], through [the CEO's] own chosen financial advisors, with little or no board oversight." *Macmillan*, 559 A.2d at 1280; *see also Xura*, 2018 WL 6498677, at *4 (discussing allegations of an inert special committee formed to evaluate and negotiate a transaction with a bidder, including an allegation that one of its members "did not even realize that the Special Committee existed or that he was a member of the committee until he learned about it at his deposition"); *Stern*, 2018 WL 1341719, at *1 n.4 (noting that a variant of *Macmillan* claim exists where "impartial board members did not oversee conflicted members sufficiently").

Defendants dispute the relevance of the Board's conduct because no director is alleged to have breached his or her fiduciary duty as a director. In Defendants' terms, Plaintiff "must plead a breach of duty by Roche or Tauscher to state a fiduciary-breach claim against Roche or Tauscher." Defs.' Reply Br. 20–23.

---

[156] Pl.'s Ans. Br. 46 (quoting *Toys "R" Us*, 877 A.2d at 1002).

Defendants are correct, but it is nevertheless important to address the Board's involvement in the Buyout process to determine whether the Complaint pleads facts that could support a reasonable inference that Roche and Tauscher took advantage of an inattentive or ineffective Board.

The Complaint does not so plead. The Complaint does not allege that any of the ten outside directors on the Board was dominated by Roche or Tauscher, suffered from any conflict of interest, or acted in bad faith. In its Answering Brief, Plaintiff argues that it has not "concede[d] that any Blackhawk directors were impartial or acted in good faith in approving this process,"[157] but because the Complaint contains no allegations to the contrary, the only reasonable inference is that these ten members of the Board were independent and disinterested.[158] The uncontested independence and disinterestedness of the Board is not alone dispositive of Plaintiff's claim against Roche and Tauscher.[159] Setting aside the omission of

---

[157] Pl.'s Ans. Br. 52.

[158] *See Baker Hughes Inc.*, 2020 WL 6281427, at *6 (noting that "Plaintiffs tacitly concede the independence and disinterestedness of twelve of the thirteen members of the Board and that they cannot allege a non-exculpated claim against the members of the Board" by amending their pleadings to omit claims against outside directors).

[159] *Stern*, 2018 WL 1341719, at *1 ("To the extent, however, that the Court of Chancery's decision suggests that it is an invariable requirement that a plaintiff plead facts suggesting that a majority of the board committed a non-exculpated breach of its fiduciary duties in cases where *Revlon* duties are applicable, but the transaction has closed and the plaintiff seeks post-closing damages, we disagree with that statement.").

allegations against the ten outside directors, however, the overall narrative presented by the Complaint contradicts Plaintiff's pejorative labeling of the Board as supine.

The Complaint alleges that, on the eve of the Buyout process, the Board instructed Blackhawk's management to revise its budget that allocated $1.1 billion over three years for acquisitions and requested a three-year budget "that includes a more aggressive M&A strategy as a means of accelerating the growth of the Company and in shareholder value."[160] The Complaint alleges that, after receiving the First Indication of Interest on October 20, 2017, the Board met six times to consider Silver Lake and P2's proposal before the execution of the Merger Agreement. In 2017, the Board met on November 6, November 21, December 4, and December 13.[161] In 2018, the Board met on January 11 and January 14, before the Merger Agreement was executed on January 15, 2018.[162] The Complaint further alleges that, during these meetings, the Board considered management projections and analyses from Sandler regarding the value of the Buyout as compared to the value of the Company as a standalone entity. In short, the Complaint alleges that the Board met, engaged with management and advisors, and deliberated during regular intervals during the Buyout process.

---

[160] Compl. ¶ 49.

[161] *Id.* ¶¶ 64, 71, 74, 79.

[162] *Id.* ¶¶ 84, 89, 91.

In its Answering Brief, Plaintiff essentially asserts that there were windows of inattention by the Board during the Buyout process that permitted Roche and Tauscher to act without Board supervision.[163] As an example, in its Answering Brief, Plaintiff argues that Roche and Tauscher were "engaged in unchaperoned discussions with Silver Lake and P2 for months before Silver Lake/P2 submitted a bid" regarding the Company's capital structure.[164] The Complaint alleges that the discussions were "about a potential minority private investment in the Company's equity"—not the Buyout—and that the "Board discussed the potential [minority] investment by Silver Lake/P2 at its meeting on July 17, 2017."[165] Plaintiff insinuates that Roche and Tauscher intentionally depressed Blackhawk's stock price by issuing revised guidance, but the revised guidance proved accurate and there is no well-pleaded allegation that Roche and Tauscher knew that they would personally benefit by issuing more pessimistic earnings guidance.[166] Plaintiff faults Roche and

---

[163] Pl.'s Ans. Br. 46–51 (citing Compl. ¶¶ 43, 44, 60, 63–64, 67–76, 81, 82, 83, 85, 86, 90, 93–99, 100–05, 113–14 and 116).

[164] Pl.'s Ans. Br. 46.

[165] Compl. ¶¶ 43–45, 60. *Cf. Macmillan*, 559 A.2d at 1281 (observing that management met with a potential acquirer to discuss a management-sponsored buyout without board approval, and then the board allowed conflicted management to select the company's financial and legal advisers).

[166] This case is unlike *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *20 (Del. Ch. Oct. 2, 2020), where the Court concluded that it was reasonably conceivable that the CEO provided earnings guidance for reasons unrelated to business expectations when it later turned out that the actual quarterly results beat not only the lowered guidance target,

46

Tauscher for permitting Silver Lake and P2 to conduct further due diligence after they received the First Indication of Interest, but the Complaint alleges that the Board had already allowed "Silver Lake/P2 to continue doing due diligence on the Company" to facilitate a potential minority investment, and that management reported the status of due diligence to the Board at its November 6, 2017 meeting.[167]

In fact, Plaintiff's assertions of Board inattention are belied by allegations that Roche reported to the Board and that the Board approved management's decisions. For example, Plaintiff contends that Roche and Tauscher ignored Thoma Bravo's email outreach.[168]  But within one week of Roche's receiving the email, the Complaint alleges that the Roche "reported on the outreach" by Thoma Bravo at the following Board meeting.[169]  The Complaint alleges that the Board "determined not to engage" because, in part, engaging with Thoma Bravo "could result in the loss of the potential [Buyout]" and the go-shop would "permit the Company to solicit an acquisition proposal from [Thoma Bravo]" after entry into the Merger Agreement.[170]

---

but also the prior estimates.  In this case, Blackhawk's actual earnings figure for 2017 was consistent with the low point of the earnings guidance announced in October 2017. *Compare* Jackson Aff. Ex. 20 (Blackhawk Form 8-K, dated February 27, 2018, announcing Blackhawk's 2017 adjusted EBITDA to be $224.9 million), *with* Jackson Aff. Ex. 7 (Blackhawk Form 8-K, dated October 11, 2017, reporting guidance for Blackhawk's 2017 adjusted EBITDA to be $225–250 million).

[167] Compl. ¶¶ 45, 64.

[168] Pl.'s Ans. Br. 48.

[169] Compl. ¶ 86.

[170] *Id.*

The Complaint thus alleges that the Board, not Roche or Tauscher, decided not to engage with Thoma Bravo prior to entry into the Merger Agreement. Plaintiff similarly alleges that the go-shop provision prohibited the Board from changing its recommendation or terminating the deal, but that, too, was a Board decision made after the Board's legal advisor discussed the terms of the go-shop provision and the draft Merger Agreement.[171] And Plaintiff alleges that Roche and Tauscher acted improperly by agreeing to "defer[] . . . discussions regarding transaction price" until after Silver Lake and P2 completed due diligence, but Roche and Tauscher reported that decision to the Board in short order.[172] These allegations do not support a reasonable inference of a board "exhibiting indolent or apathetic inertia or passivity,"[173] or otherwise having been manipulated by Roche and Tauscher during the Buyout process.

---

[171] *See* Proxy 32; Jackson Aff. Ex. 19. Plaintiff alleges that the go-shop provision in the Merger Agreement achieved the opposite effect of a typical go-shop provision by precluding the Board from accepting proposals solicited during the go-shop period. As discussed in further detail below, this allegation supports a claim that Roche breached her fiduciary duty of care by issuing a misleading Proxy that characterized the go-shop as permitting the Company to "terminate the merger agreement to enter into an agreement with respect to a superior proposal during the go-shop period." Proxy 35. The allegedly malfunctioning go-shop provision, however, does not support a claim that Roche and Tauscher breached their fiduciary duty as officers because there is no well-pleaded allegation that Roche and Tauscher approved the go-shop in order to advance their own self-interest or that they deceived the Board as to the contents of the Merger Agreement.

[172] Compl. ¶ 64.

[173] *Merriam-Webster's Collegiate Dictionary* 1184 (10th ed. 1997) (defining "supine").

48

## b. The Complaint Does Not Contain Well-Pleaded Allegations Supporting a Reasonable Inference that Roche and Tauscher Deceived the Board.

An officer may breach his or her duty by deceiving an independent board of directors into favoring a bidder. *Macmillan*, 559 A.2d at 1279; *Stern*, 2018 WL 1341719, at *1 n.4; *Comstock*, 2016 WL 4464156, at *19. Plaintiff claims that the outside directors were materially uninformed as to five issues: (1) the substance of Defendants' discussions with Silver Lake and P2 before the First Indication of Interest; (2) the real reason that management was reducing the Company's financial projections; (3) "the fact that the Merger Agreement would preclude any solicited topping bids, including from [Thoma Bravo]"; (4) the alleged conflicts of interests faced by Roche, Tauscher, and the Board's legal and financial advisors; and (5) "the contents of the materially misleading Proxy."[174] The Opinion discusses each in turn.

### i. Silver Lake/P2 Discussions

It is not reasonably conceivable from the Complaint that Defendants deceived the Board regarding the contents of their discussions with Silver Lake and P2 before the First Indication of Interest. The Complaint alleges that the discussions between Roche and Tauscher and Silver Lake and P2 before the First Indication of Interest concerned "a potential minority private investment," not the Buyout.[175] The

---

[174] Pl.'s Ans. Br. 51 (citing Compl. ¶¶ 43–44, 60, 63, 67-76, 85, 86, 90, 92-115, 116 & Jackson Aff. Ex. 19).

[175] Compl. ¶ 43.

Complaint also alleges that the Board discussed that potential investment at the July 17, 2017 Board meeting, and permitted Silver Lake and P2 to continue conducting due diligence on the Company.[176] Plaintiff insinuates that a reference to a previously discussed "capital structure" in the First Indication of Interest suggests that Roche and Tauscher were acting improperly, but Plaintiff does not explain the significance of this reference, or how its nondisclosure was material to the Buyout process.[177] Plaintiff does not allege, for example, that Roche and Tauscher had discussed selling the Company to Silver Lake and P2 when they were purportedly discussing a potential minority investment. In the absence of such allegations, the reference to a previously discussed capital structure is not sufficient to support a reasonable inference that Roche or Tauscher deceived the Board.

### ii.    Lowered Projections

It is not a reasonably conceivable inference that Roche and Tauscher deceived the Board through downwardly-adjusted management projections. Plaintiff argues that comparing the segment analyses in the November 6 Presentation and the December 4 Presentation reveals that Roche's statement to the Board on November 21 that management expected lower-than-expected performance in 2018 because "challenges in [the Company's] U.S. retail sector would limit organic growth" was

---

[176] *Id.* ¶¶ 44–45.

[177] *Id.* ¶ 60.

50

false.[178]  Roche's statement was not false.  On December 4, 2017, management projected 2018 EBITDA from the Company's U.S. retail sector to be lower than previously projected on November 6.  Even though the decrease was not significant and did not account for a majority of the change in the Company's performance, the projections are consistent with Roche's disclosed statement that challenges in that sector "would limit organic growth" and caused a decrease in management projections.  As important, Plaintiff does not dispute that the Board received each of the projections and was capable of independently assessing whether Roche's narrative regarding the Company's performance was accurate or requesting further information regarding management projections.

### iii.    The Go-Shop

Plaintiff contends that, at the January 11, 2018 Board meeting, Roche and Tauscher falsely persuaded the Board not to proceed with Thoma Bravo prior to entry of the Merger Agreement because Thoma Bravo could be re-engaged during the go-shop period.  But the Complaint does not allege that Roche or Tauscher discussed that provision at the January 11 Board meeting.  The Proxy and the Board minutes reflect that the Board's legal and financial advisors—not Roche and

---

[178] Proxy 30.

51

Tauscher—discussed the terms of the draft Merger Agreement with the Board.[179] In addition, Plaintiff does not dispute that Thoma Bravo reiterated its interest in acquiring the Company after the announcement of the Merger Agreement, as disclosed in the Proxy.[180] The Complaint does not otherwise allege that Roche and Tauscher deceived the Board regarding the operation of the go-shop provision or sabotaged the process.[181]

---

[179] Compl. ¶ 86; Proxy 32 ("On January 11, 2018, a special in-person meeting of the Blackhawk board of directors was held, which representatives of Wachtell Lipton and Sandler O'Neill attended. Representatives of Wachtell Lipton discussed the key terms of the draft merger agreement, including closing conditions, termination provisions, regulatory considerations and the structure of the go-shop period."); Jackson Aff. Ex. 16 ("The Board, Wachtell Lipton and Sandler O'Neill then discussed the potential benefits and risks of engaging with Party A at this time, including that Party A would likely need to do significant diligence in order to finalize a potential transaction, that a transaction with the Buyer Group could likely be finalized in the next several days, that engaging with Party A could result in the loss of the potential transaction with the Buyer Group, and that the "go-shop" provisions of the draft merger agreement would permit the Company to solicit an acquisition proposal from Party A after signing a definitive merger agreement with the Buyer Group. Following this discussion, the Board determined not to engage with Party A at this time.").

[180] Even assuming that the go-shop provision had been finalized in the draft Merger Agreement by the January 11, 2018 Board meeting, the Board may not have been later precluded from terminating the Merger Agreement in response to Thoma Bravo's overtures. As discussed further below, the structure of the go-shop may have precluded the Board from terminating the Merger Agreement in response to a solicited proposal, but Thoma Bravo solicited the Company both before and after the signing of the Merger Agreement, not *vice versa*. *See* Compl. ¶ 82 (describing Thoma Bravo's outreach pre-Buyout); Proxy 33 ("Shortly following the public announcement of the merger agreement, Party A contacted the Company to indicate that they were interested in engaging with the Company during the go-shop period.").

[181] *Cf. Gantler*, 965 A.2d at 709 (holding officer's failure to respond to a bidder's due diligence requests, which later led to withdrawal of the bid, supported an inference that the officer sabotaged the bid and, thus, stated a claim for breach of fiduciary duty).

### iv.    Conflicts

Plaintiff claims that Roche and Tauscher did not disclose their purported conflicts of interests to the Board, as well as the alleged conflicts of interests suffered by the Company's financial and legal advisors.  As discussed above, there are no well-pleaded allegations that Roche and Tauscher were conflicted.  With respect to the Company's financial and legal advisors, even assuming their connections to Silver Lake (golf-based and otherwise) were material, the Complaint does not allege that Roche and Tauscher were aware that these conflicts of interest existed.

### v.    The Proxy Disclosures

Plaintiff contends that Roche and Tauscher caused the Company to issue a misleading Proxy and misled the Board regarding the "contents of the materially misleading Proxy."[182]  But there is no well-pleaded allegation that Defendants misled the Board regarding the Proxy.[183]  In its Answering Brief, Plaintiff suggests that the Board did not review the Proxy because, on January 14, 2018, the Board authorized

---

[182] Pl.'s Ans. Br. 48, 51.

[183] The only paragraph of the Complaint cited in Plaintiff's Answering Brief to support this assertion does not allege that Roche or Tauscher misled the Board regarding the Proxy. Pl.'s Ans. Br. 51–52 (citing Compl. ¶ 116).  *See* Compl. ¶ 116 ("Defendants caused Blackhawk to file the Proxy with the SEC on March 2, 2018. As Roche stated in her cover letter, the primary message of the Proxy was that "the [Board] unanimously recommends that our stockholders vote 'FOR' the proposal to adopt the merger agreement." In advocating the Buyout, however, the Proxy was materially false and misleading in significant respects.").

the executive officers of the Company to issue the Proxy.[184]  That does not mean that Roche and Tauscher prevented the Board from reviewing the Proxy or misled the Board regarding its contents.

In summary, the Complaint lacks well-pleaded allegations that Roche and Tauscher harbored any conflict of interest during the Buyout process.  Even under the assumption that Defendants had a conflict of interest, the Complaint does not contain well-pleaded allegations that they manipulated or deceived the Board in order to favor Silver Lake and P2.  Thus, for the foregoing reasons, the Complaint does not state a claim that Roche and Tauscher breached their fiduciary duties as officers by favoring Silver Lake and P2 or misleading the Board into approving the Buyout.

### B. The Complaint States a Claim for Breach of the Duty of Care as to the Proxy Disclosures.

The Complaint alleges that Defendants breached their fiduciary duty in their capacity as officers by approving a materially misleading Proxy.  "'Under Delaware law, when directors solicit stockholder action, they must disclose fully and fairly all material information within the board's control.'"  *Baker Hughes*, 2020 WL 6281427, at *12 (quoting *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017)).  Officers may breach their fiduciary duties to the extent

---

[184] Pl.'s Ans. Br. 48–49 (arguing that "[t]here is no evidence the Board even reviewed the Proxy") (citing Jackson Aff. Ex. 19 at HAWK0000152).

they are involved in preparing a proxy statement that contains materially misleading disclosures or omissions. *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at *11 (Del. Ch. June 18, 2018) (holding that a complaint stated a claim against an officer for violation of the fiduciary duty of disclosure and noting that directors and officers of a corporation generally owe the same fiduciary duties); *see also Baker Hughes*, at *15–16; *Morrison*, 2019 WL 7369431, at *25, *27.

The disclosure claims involve a two-step analysis. The first step considers whether the Complaint alleges that Defendants were involved in the preparation of the Proxy disclosures. The second addresses whether the Proxy is materially misleading and whether Defendants are protected by a fully-informed, uncoerced stockholder vote in favor of the Buyout under the *Corwin* doctrine.[185]

### 1. The Complaint Pleads Facts Supporting a Reasonable Inference That Roche (But Not Tauscher) Was Involved in Preparing the Proxy Disclosures.

Defendants argue that they cannot be held liable for materially misleading disclosures or omissions from the Proxy because "the complaint fails to allege any breach of duty by Roche or Tauscher that caused the alleged disclosure deficiencies."[186] Roche was the CEO of Blackhawk throughout the Buyout process

---

[185] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312–14 (Del. 2015).

[186] Defs.' Opening Br. 33–35.

55

and an integral figure during Buyout negotiations.[187]  The Board resolutions approving the issuance of the Proxy authorized the Company's "executive officers" to prepare and issue the Proxy and, most significantly, Roche signed the Proxy.[188] *See Baker Hughes*, 2020 WL 6281427, at \*15–16 (holding that a CEO could be liable for breach of the duty of care for a deficient proxy where the CEO was involved in the negotiation of the merger and signed the proxy); *In re Hansen Med., Inc. S'holders Litig.*, 2018 WL 3025525, at \*11 ("Vance affixed his signature to the Proxy in his capacity as President and CEO and presented the information to the stockholders for their consideration. This means he may be liable for material misstatements in the Proxy in his capacity as an officer [and] as a director."). Therefore, the Complaint alleges facts from which it can reasonably be inferred that Roche was involved in preparing the disclosures in the Proxy in her capacity as an officer of Blackhawk.

The same cannot be inferred, however, as to Tauscher.  The Complaint does not allege that Tauscher was involved in the preparation of the Proxy, and it is not reasonably inferable from the Complaint or the Proxy that he was.  Tauscher did not

---

[187] *See, e.g.*, Compl. ¶ 86 ("Roche reported on diligence and negotiations with Silver Lake/P2").

[188] Jackson Aff. Ex. 19 at HAWK0000152 (authorizing the "Authorized Officers" to prepare and issue the Proxy); *id.* at HAWK0000150 (defining the "Authorized Officers" as "the executive officers of the Company"); Proxy, at Cover Letter from Talbott Roche dated March 2, 2018; Compl. ¶ 116 (alleging that Roche addressed the Company's stockholders in the cover letter).

sign the Proxy. Because "the Complaint is devoid of any allegations that [the officer] had any role in drafting or disseminating the Proxy," Plaintiff has not pleaded a claim that Tauscher could have breached any fiduciary duty by issuing a materially deficient proxy. *Baker Hughes*, 2020 WL 6281427, at \*16.

### 2. The Proxy Disclosures

In a request for stockholder action, directors are under a duty to disclose fully and fairly all material facts within their control bearing on the request. *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989). A stockholder states a claim for breach of this duty if it can allege facts to support "a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading." *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotations omitted). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Indus.*, 426 U.S. at 449).

57

For the reasons addressed above, the only potential claim against Roche for issuing a materially misleading Proxy sounds in the fiduciary duty of care because there is no well-pleaded allegation in the Complaint supporting a reasonable inference that she acted in bad faith or to further her own self-interest. Roche cannot be exculpated for breaches of duty of care with respect to challenged conduct taken in her role as an officer.[189]

To state a claim for breach of the duty of care, Plaintiff must plead that Roche acted with gross negligence.[190] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'" *Baker Hughes*, 2020 WL 6281427, at *15 (quoting *Morrison*, 2019 WL 7369431, at *22). "'Because fiduciaries . . . must take risks and make difficult decisions about what is material to disclose, they are exposed to liability for breach of fiduciary duty only if their breach of the duty of care is extreme.'" *Morrison*, 2019 WL 7369431, at *25 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004)).[191]

---

[189] 8 *Del. C.* § 102(b)(7); *Baker Hughes*, 2020 WL 6281427, at *15.

[190] *Id.*

[191] The challenges to the Proxy alleged in the Complaint that are not described below do not support a claim that Defendants breached their duty of care for reasons described elsewhere in the Opinion. *See* Compl. ¶¶ 129–30. Specifically, the Proxy's failure to

58

### a. The Omission of Acquisition Projections

Plaintiff alleges the Proxy omitted material information in the form of projections relating to earnings from the Company's potential acquisitions. The Proxy contains four sets of projections: (1) the Initial Projections (disclosing projected adjusted EBITDA of $275 million for 2018, among other projections); (2) the November Estimate Range (projecting EBITDA of $240–$280 million for 2018); (3) the Preliminary 2018 Plan (projecting $260 million in adjusted EBITDA for 2018); and (4) the Revised Projections (projecting $240–$250 million in adjusted EBITDA).[192] In each case, the Proxy disclosed the Company's projected earnings without acquisitions. Plaintiff contends that the Proxy is materially misleading because it omits projected earnings from acquisitions that were considered by the Board at the same time that the Initial Projections and the November Estimate Range were presented (on November 6, 2017 and November 21, 2017, respectively). Plaintiff also alleges that the Proxy provides the misleading impression that the Initial Projections were prepared in the summer of 2017, prior to the Company's

---

disclose the management-friendly language in the indication of interest was not materially misleading in the Proxy because Roche or Tauscher were not conflicted. The allegations that the Proxy should have disclosed different reasons for lower-than-expected performance in 2018 than the reasons Roche disclosed at the November 21, 2017 Board meeting also fail because the Complaint does not contain well-pleaded facts that the stated rationale was false or materially misleading.

[192] Proxy 38, 39.

announcement of lowered guidance in October 2017.[193]  Defendants argue that the Proxy did not need to contain acquisition projections because the "complaint alleges nothing to show that the November acquisition-based projections were reliable," they were stale and "likely . . . immaterial," and that the projections were not the "best projections" available to the Company.[194]  Defendants further argue that the disclosure regarding the timing of the Initial Projections accurately reflects their preparation "sometime between the summer of 2017 and late October 2017."[195]

The Complaint alleges that the Company historically engaged in a consistent practice of growth through acquisitions and that shortly before the Buyout process began, the Company was considering expanding that strategy.  The Board considered whether to pursue its acquisition strategy as a standalone entity during the Buyout process.  Shortly before the First Indication of Interest, Sandler made a presentation to the Board stating that Blackhawk had "a full range of options to finance an aggressive M&A strategy," including through borrowing under the Company's credit agreement, issuing additional stock, obtaining a convertible debt investment, or financing acquisitions with common stock.[196]  After Silver Lake and P2 submitted the First Indication of Interest on October 20, 2017, the Company

---

[193] Pl.'s Ans. Br. 64–67.

[194] Defs.' Reply Br. 29.

[195] *Id.* at 26.

[196] Compl. ¶¶ 50, 124.

60

continued to evaluate its prospects as a standalone company, including by preparing projections that included the potential impact of acquisitions.

The Proxy selectively discloses portions of these projections. In particular, as discussed above, the November Forecast presented to the Board on November 6, 2017 contained three-year projections estimating the Company's EBITDA with and without acquisitions.[197] To estimate potential earnings from acquisitions, the November Forecast assumed that the Company would spend $700 million in acquisitions over the following three years.[198] As Plaintiff alleges, "[t]he $700 million acquisition plan was projected to add $98 million in yearly EBITDA by 2020, representing approximately 25% of Blackhawk's 2020 adjusted EBITDA."[199] The Initial Projections disclosed in the Proxy were derived from the November Forecast, but excluded projected earnings from acquisitions as presented to the Board.[200] The Proxy similarly omitted acquisition projections from the November Estimate Range assuming that the Company would earn $20 million in EBITDA for acquisitions in 2018.[201]

_____

[197] Compl. Ex. A.

[198] *Id.* at 10.

[199] Compl. ¶ 120.

[200] Proxy 38.

[201] *Id.* at 39.

61

Cast against this background, the Complaint adequately pleads that omission of the acquisition projections presented to the Board during the Buyout process was material. A reasonable stockholder would have wanted to know information regarding management's projections of the Company's potential earnings from acquisitions, especially because the acquisition projections were provided to the Board. Those projections would have altered the "total mix" of information available because they would have formed a basis against which a reasonable stockholder could compare the price she would receive through the Buyout and to assess the basis for the Board's recommendation of the Buyout. The Company's ability to pursue a standalone acquisition strategy was considered by the Board several times, including on October 9, 2017 (before the Buyout process began), at the November 9 Board meeting, and again at the December 13 Board meeting.

Defendants argue that the acquisition projections were immaterial because they were speculative and that subsequent market events rendered them unreliable. To support this argument, Defendants cite *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *13 (Del. Ch. Feb. 29, 2012), for the proposition that "Delaware law does not require disclosure of inherently unreliable or speculative information." The Court in *Micromet* was deciding a motion for preliminary injunction and based its decision on discovery relating to the challenged disclosures. *Id.* (holding that undisclosed projections were unreliable in part because the CEO testified that they

were "not realistic" and a director testified that they were "highly subjective").  By contrast, the Court does not have the benefit of a discovery record in adjudicating Defendants' motion to dismiss.  As a consequence, accepting Defendants' argument regarding the weight of the acquisition projections would require drawing an impermissible inference in favor of Defendants at this stage.  *See Savor*, 812 A.2d at 897 ("[T]he Court must draw all reasonable inferences in favor of the non-moving party").

The omission of the acquisition projections from the Initial Projections and the November Estimate Range is compounded by the Proxy's description of the Initial Projections.  The Proxy states that the Initial Projections were "based on the information contained in Blackhawk's financial model, which was prepared by Blackhawk's management during the Summer of 2017 from financial models used in connection with its annual internal planning processes, and were provided to Sandler O'Neill, [Silver Lake and P2], and the Blackhawk board of directors in late October and early November 2017."[202]  The "Initial Projections" refer to the November Forecast, with acquisition projections excised.  The Proxy is misleading because the Initial Projections were not generated in "the Summer of 2017"—they were prepared in November 2017 and compared to projections made in July 2017.

---

[202] Proxy 38.

Defendants argue that the Proxy "tell[s] the reader that they were an update of a projection model prepared several months earlier," but there is no reference to any "update" in the Proxy language.[203]  Instead, the Proxy states that the Initial Projections were based on management's financial model prepared in the summer of 2017 and "provided to Sandler O'Neill, the Sponsors and the Blackhawk board of directors in late October and early November 2017."  Defendants also imply that whether the Initial Projections were prepared in the summer of 2017 or November 2017 is immaterial,[204] but that argument ignores the fact that Roche announced downward revisions to the Company's earning guidance in October 2017.[205]

Viewed in totality and drawing all reasonable inferences in favor of Plaintiff, the Complaint supports a reasonable inference that the Proxy selectively disclosed projections regarding its potential earnings in a manner that rendered the Proxy disclosures misleading because, under these circumstances, a reasonable stockholder would have wanted to know management's projections of earnings from acquisitions in deciding how to vote.  *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) (enjoining a transaction because the proxy

---

[203] Defs.' Opening Br. 38.

[204] *Id.* at 38–39.

[205] Compl. ¶ 58 ("On October 11, 2017, the Company announced negative guidance and management made public comments that created uncertainty about the Company's growth prospects.").

statement "selectively disclosed projections relating to [the company's] future performance" that related to the "value that might obtain if the corporation remains independent and delivers on management's expected cash flows"); *NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*, 2017 WL 4453561 (D. Or. Oct. 3, 2017) (holding that a proxy statement was materially misleading because the company's "acquisition strategy was a continuing part of its business plan" and the proxy disclosed projections that excluded the effect of future acquisitions), *report and recommendation adopted*, 2018 WL 533912 (D. Or. Jan. 24, 2018).

### b.    The Go-Shop Provision

The Complaint alleges the Proxy disclosures describing the Board's right to terminate the Merger Agreement in response to a superior acquisition proposal during the go-shop is false.  According to the Proxy, during the go-shop period, the Board may "solicit higher offers during the go-shop period and to consider and negotiate certain higher offers thereafter, including the Company's right to solicit offers with respect to acquisition proposals during a 25-day go-shop period and to terminate the Merger Agreement to enter into an agreement with respect to a superior proposal during the go-shop period," subject to payment of a termination fee.[206]

---

[206] Proxy 35.

Section 7.1(a)(i) of the Merger Agreement permits the Company to "initiate, solicit, facilitate and encourage Acquisition Proposals" for a period of 25 days.[207] Except in the case of a material positive event, Section 7.2(c) prohibits the Board from changing its recommendation regarding the Buyout or terminating the Merger Agreement to enter into an alternative merger agreement unless the Board determined that a competing acquisition proposal was a "Superior Proposal."[208] In pertinent part, Section 7.2(c) states:

> (c) <u>No Change in Recommendation or Alternative Acquisition Agreement.</u> Except as set forth in this Section 7.2(c), the Company Board . . . shall not:
>
> (i) (A) withhold, withdraw, qualify or modify (or publicly propose or resolve to withhold, withdraw, qualify or modify), in a manner adverse to Parent, the Company Recommendation with respect to the Merger, (B) authorize, approve, recommend or otherwise declare advisable, or publicly propose to authorize, approve, recommend or otherwise declare advisable, any Acquisition Proposal or proposal reasonably likely to lead to an Acquisition Proposal, (C) fail to include the Company Recommendation in the Proxy Statement, (D) take any action or make any recommendation or public statement in connection with a tender offer or exchange offer other than an unequivocal recommendation against such offer or a temporary "stop, look and listen" communication by the Company Board of the type contemplated by Rule 14d-9(f) under the Exchange Act in which the Company Board or the Company indicates that the Company Board has not changed the Company Recommendation or (E) fail to reaffirm the Company Recommendation within the earlier of three Business Days prior to the Stockholders Meeting and five Business Days after receiving a written

---

[207] Merger Agreement § 7.1(a)(i). The Merger Agreement is attached to the Proxy as Annex A.

[208] *Id.* § 7.2(c).

request to do so from Parent (any of the foregoing, a "Change of Recommendation"); or

(ii) except as expressly permitted by, and after compliance with, the last paragraph of this Section 7.2(c), cause or permit the Company or any of its Subsidiaries to enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement or other similar agreement (other than a confidentiality agreement referred to in Section 7.2 (a) or 7.2(b) entered into in compliance with Section 7.2(a) or 7.2(b)) (an "Alternative Acquisition Agreement") relating to any Acquisition Proposal or otherwise resolve or agree to do so.

Notwithstanding anything to the contrary set forth in this Section 7.2(c), the Company Board may, prior to but not after the time the Requisite Company Vote is obtained, . . . (B) make a Change of Recommendation or, prior to the expiration of the Go-Shop Period only, authorize the Company to terminate this Agreement pursuant to Section 9.3(a) if the Company receives an Acquisition Proposal and (I) prior to taking such action, the Company Board determines in good faith, after consultation with its outside legal counsel and financial advisor, that failure to take such action, in light of the Acquisition Proposal and the terms of this Agreement, would reasonably be expected to be inconsistent with the directors' fiduciary duties under applicable Law and (II) the Company Board has determined in good faith, based on the information then available and after consultation with its outside legal counsel and financial advisor, that such Acquisition Proposal constitutes a Superior Proposal[.][209]

Section 10.13 of the Merger Agreement defines Superior Proposal as an "unsolicited

*bona fide* written Acquisition Proposal."[210]

---

[209] *Id.*

[210] *Id.* § 10.13.

The Proxy's disclosure about the go-shop period is contrary to the Merger Agreement. The Proxy indicates that the Board may terminate the Merger Agreement to enter into a solicited "superior proposal during the go-shop period."[211] In fact, under the structure of the Merger Agreement, the Board was only allowed to change its recommendation or to terminate the Merger Agreement in response to an unsolicited acquisition proposal.[212]

Defendants do not contest that the plain language of the Merger Agreement prohibited the Company from entering into any alternative acquisition proposal solicited during the go-shop period. Rather, Defendants argue that Plaintiff's construction of the go-shop would negate the purpose of the go-shop and is contrary to the way "anyone" interpreted the go-shop.[213] To survive a motion to dismiss, however, Plaintiff must only proffer a reasonable reading of the contract, and Plaintiff has done so here.[214] Defendants further argue that any person could read

---

[211] Proxy 35.

[212] The Merger Agreement does not define the term "solicit."

[213] The concept of contractual language that prevents a Board from changing its recommendation except in response to an unsolicited offer is not unprecedented. *Cf. In re NYSE Euronext S'holders Litig.*, C.A. No. 8136-CS (Del. Ch. May 10, 2013) (TRANSCRIPT) (declining to issue an injunction challenging a merger agreement that prevented a board from changing its recommendation unless it received a "Superior Proposal," defined as an unsolicited offer for 100% of the company's assets or stock).

[214] "At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party. Thus, '[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation[s] [are] the *only* reasonable construction[s] as a matter

68

the provision because the Merger Agreement was attached to the Proxy as Annex A. Attaching the Merger Agreement does not cure the Proxy's inaccurate and misleading disclosure regarding the go-shop. *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007) (holding that to satisfy the duty of disclosure, "directors must also avoid making materially misleading disclosures, which tell a distorted rendition of events or obscure material facts."). A reasonable stockholder is not required to validate each disclosure by reference to the underlying contract. *See Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) ("Under Delaware law, when a board chooses to disclose a course of events or to discuss a specific subject, it has long been understood that it cannot do so in a materially misleading way, by disclosing only part of the story, and leaving the reader with a distorted impression.").

### 3. The Complaint Pleads Facts Supporting the Availability of Damages.

Defendants contend that, even if the Proxy is materially misleading, the Complaint does not plead causation or damages arising from the Proxy. To state a claim for damages from a breach of the duty of disclosure, "the damages must be logically and reasonably related to the harm or injury for which compensation is

---

of law." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *8 (Del. Ch. Sept. 18, 2014) (emphasis in original) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

being awarded." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). Thus, a complaint must typically allege "(i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders on the information that was not disclosed, and (iii) damages proximately caused by that failure." *Chatham Asset Mgmt., LLC v. Papanier*, 2017 WL 6550428, at *5 (Del. Ch. Dec. 22, 2017) (internal quotations omitted).

For the reasons discussed above, the Complaint has alleged that Roche may be subject to liability for non-exculpated gross negligence to the extent that she was involved in preparing a materially misleading proxy. The Complaint has also adequately pleaded reliance because, at the pleading stage, the Complaint need not prove "actual reliance on the disclosure, but simply that there was a material misdisclosure." *Metro Commc'n Corp. BVI v. Adv. Mobilecomm Techs., Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004). The Complaint need not plead that omissions or misleading disclosures were so material that they would cause a reasonable investor to change his vote. *Morrison*, 191 A.3d at 283 ("[The] materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.") (internal quotations omitted).

At this stage, the Complaint adequately alleges damages to survive dismissal.[215] As Plaintiff argues, if it proves that Roche "committed a non-exculpated breach of the fiduciary duty of disclosure, then damages can be awarded using a quasi-appraisal measure." *Chen*, 87 A.3d at 691 (citing *In re Orchard Enters., Inc. S'holder Litig.*, 2014 WL 1007589, at \*32–\*43 (Del. Ch. Feb. 28, 2014)). In their Reply Brief, Defendants identified no reason why quasi-appraisal damages would be unavailable beyond arguing that Plaintiff has failed to plead a breach of fiduciary duty.[216] Because the Complaint does plead a breach of fiduciary duty, however, further "consideration of damages awaits a developed record." *Morrison*, 2019 WL 7369431, at \*22 n.273; *see also Baker Hughes*, 2020 WL 6281427, at \*15–16 (denying motion to dismiss breach of fiduciary duty claim seeking compensatory damages against an officer for his involving in preparation of a proxy statement).

### 4. *Corwin* Cleansing Does Not Apply.

Defendants argue that the Complaint is subject to dismissal under *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312–14 (Del. 2015), because Defendants obtained a cleansing stockholder vote. As discussed above, Plaintiff has stated a claim that the Proxy contained material omissions and misleading disclosures.

---

[215] Compl. ¶¶ 141, 146.

[216] Defs.' Reply Br. 25.

71

Therefore, Defendants have not established that the stockholder vote approving the Buyout was fully informed.  Accordingly, the Complaint is not subject to dismissal under the business judgment rule.  *Corwin*, 125 A.3d at 312 ("[T]he doctrine applies only to fully informed, uncoerced stockholder votes"); *Baker Hughes*, 2020 WL 6281427, at *14.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted with respect to the claims against Tauscher.  Defendants' Motion to Dismiss is granted in part and denied in part with respect to the claims against Roche.

IT IS SO ORDERED.